UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SARAH ELIZABETH FREY, KEVIN ENRIGHT, and PROTECT OUR WOODS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CAUSE NO. 1:00-cv-660-RLY-KPF |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Stephen L. Johnson, Administrator, and CBS CORP., | ) ) ) ) ) | |
| Defendants. | ) | |

**ENTRY ON ALL PENDING SUMMARY JUDGMENT MOTIONS**

This matter involves private citizen plaintiffs who have sued in an effort to

challenge the process and cleanup methodology employed by the Environmental

Protection Agency ("EPA") and the party being held responsible for PCB and other

contamination at three dump sites near Bloomington, Indiana.  This case, like the

underlying cleanup, has faced numerous obstacles and detours as it moved along at less-

than-optimum speed.  It has been appealed twice and is now before the court on cross

motions for summary judgment.  One of the motions has been filed by the Plaintiffs

(Docket # 33[1]), and one each by the two Defendants, CBS Corporation ("CBS") and EPA

(Docket ## 30 and 31, respectively).  Oral argument was heard on August 17, 2007.  For

---

[1] Docket # 33 corrected and replaced the Plaintiffs' first motion, Docket # 32.

the reasons discussed in this entry, the Court finds that CBS is entitled to summary

judgment in its favor on the only two counts directed at it and EPA is entitled to summary

judgment on three of the six counts brought against it.

## Summary Judgment Standard

Summary judgment is available if there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  To

determine whether any genuine factual issue exists, a court examines the pleadings and

the evidence as presented in depositions, answers to interrogatories, admissions, and

affidavits of record.  *First Bank & Trust v. Firstar Information Services, Corp*., 276 F.3d

317 (7th Cir. 2001). The court also draws all reasonable inferences from undisputed facts

in favor of the non-moving party and views the disputed evidence in the light most

favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986).

However, the non-moving party may not rest upon mere allegations in the pleadings or

upon conclusory statements in affidavits; rather, he must go beyond the pleadings to

support his contentions with properly admissible evidence.  *Celotex Corp. v. Catrett*, 477

U.S. 317 (1986).

## Background

In April 1981, the City of Bloomington and Monroe County brought suit against

CBS to compel it to clean up certain dump sites which were contaminated with PCBs by

its predecessor.  Cause No. 1:81-cv-448-RLY-KPF.  In January 1983, the United States

2

initiated a civil action against CBS under CERCLA, 42 U.S.C. §§ 9601, *et seq.*, to clean up other contaminated sites in the area and the state of Indiana intervened as a plaintiff. Cause No. 1:83-cv-009-RLY-KPF.  The two cases, which we refer to herein as the consent decree litigation, were treated for pretrial purposes as consolidated[2] and, in 1985, the parties entered into, and the court issued, a consent decree that ordered CBS to excavate completely the six contaminated dump sites, meaning down to bedrock, and to burn the PCB-laden earth in a trash-fired high-temperature incinerator to be constructed at CBS's expense.[3]

In February 1988, one of the plaintiffs in the action at bar, Sarah Frey, and other private citizens filed suit against EPA to challenge the proposed incineration remedy but that suit and another action challenging the remedy were dismissed for lack of subject matter jurisdiction.  CERCLA restricts the timing of judicial review of EPA-approved remedies.  42 U.S.C. § 9613(h).  Despite the contention by Frey and her fellow plaintiffs that their suit challenged only EPA's procedures when selecting the remedy, this court and the Seventh Circuit Court of Appeals found that, on a fair reading of the complaint, it

---

[2] The two cases were not formally consolidated until Magistrate Judge Kennard P. Foster entered his November 21, 2006, Order consolidating the cases under Cause No. 1:81-cv-448-RLY-KPF.

[3] Both this court and the Court of Appeals for the Seventh Circuit have detailed the background of this dispute on more than one occasion.  While the background provided in this Entry attempts to provide the facts and procedural history essential to this decision, the factual discussions in the previous opinions of both courts can be reviewed for a more complete comprehension of this long-running litigation.

was the remedy itself that was being attacked and, under § 9613(h), such a challenge was

premature because the remedy had yet to be completed.  *Schalk v. Reilly,* 900 F.2d 1091,

1095-97 (7th Cir.), *cert. denied*, 498 U.S. 981 (1990).[4]  As the Seventh Circuit stated:

> Congress intended by this statute to prevent unnecessary delay in
> implementing hazardous waste cleanups.  That type of delay would surely
> result if plaintiffs were successful in requiring the EPA to conduct
> Environmental Impact Statements and further Feasability Studies.  The
> statute precludes federal court review at this stage – when a remedial plan
> has been chosen, but not "taken" or "secured."

*Id*. at 1095.

In 1991, the Indiana legislature enacted legislation that was intended to block the

construction of the incinerator by preventing authorities from issuing the necessary state

permits for its construction.  Rather than obtain enforcement of the decree, the consent-

decree parties returned to the negotiating table and, over the next few years, agreed to and

implemented alternative cleanup methods on a site-by-site basis.  At various points, the

parties proposed, and the court issued, certain site-specific amendments to the consent

decree reflecting those agreements.  The continued, active involvement and facilitation by

Magistrate Judge Foster as special master in the consent decree litigation demonstrates

that there has been an ongoing concern by the court that attention be paid to the

---

[4] In *Schalk*, the Seventh Circuit wrote of a lack of jurisdiction as the basis for affirming the court's dismissal.  However, in its opinion on the next appeal, it "tightened" its earlier loose terminology:  it explained that dismissal was not based on the court's lack of power to adjudicate the case but on the plaintiffs' failure to satisfy statutory prerequisites.  *Frey v. Environmental Protection Agency*, 270 F.3d 1129, 1132 (7th Cir. 2001).

completion of cleanups of the contaminated sites.[5]

Subsequent to the Indiana legislature's action, the three sites involved in this litigation — Bennett's Dump, Neal's Landfill, and Lemon Lane Landfill — were each the subjects of an EPA Record of Decision ("ROD")[6] that was issued after a period of public comment.  These new cleanup plans provided for excavating the areas of each site that had the highest concentrations of PCB contamination (called "hot spot removal"), transporting this soil for off-site disposal, consolidating the remaining soil at each site, and capping it.  Plans for the remediation of ground and surface water and stream sediments were to be addressed after the soil remediation was complete.[7]  Believing that this substitute remedy was both inadequate and dangerous, plaintiffs commenced this suit to stop it.  After a hearing on the plaintiffs' request for a temporary restraining order before the late Judge S. Hugh Dillin, he again dismissed the suit for lack of jurisdiction.

The appeal of that dismissal again focused attention on the meaning of CERCLA's judicial review restrictions.  In *Frey v. Environmental Protection Agency*, 270 F.3d 1129

---

[5] As indicated in status reports and representations by the consent decree parties, it is clear that their intention has been to eventually propose a comprehensive amendment to the consent decree that would finalize and incorporate the previous site-by-site agreements.

[6] An ROD represents the official selection of a remedy by EPA and sets forth the cleanup goals and remediation methodology.  A consent decree sets forth the nature of any settlement reached between the agency and any parties being held responsible for contamination.  Both a ROD and a consent decree are subject to periods of public comment before official adoption. *See* 40 C.F.R. § 300.430 and 28 C.F.R. § 50.7.

[7] Interim water treatment methods were implemented.

(7th Cir. 2001)("*Frey I*"), the Seventh Circuit held that 42 U.S.C. § 9613(h)(4) did not

eliminate judicial review of EPA remediations for an indefinite period or for so long as

there was any attention being paid to the site by EPA, but that it did restrain suits when

remedial action remained incomplete. *Frey I*, 270 F.3d at 1134. The Court specifically

rejected the Plaintiffs' argument that the statute allowed them to challenge a completed

discrete stage of the remediation. *Id.* The Seventh Circuit held, however, that § 113(h)

did not go so far as to bar citizen suits during the often-lengthy, post-remediation

governmental or contractor supervision at cleanup sites, drawing a distinction between

"active steps designed to clean up a site and later measures designed to monitor success

...". *Id.* The Court went on to state:

> Nor does our reading suggest that § 113(h) precludes a lawsuit merely
> because there is a hypothetical possibility that later monitoring might lead
> the EPA or the state authorities to devise a follow-up remediation plan. The
> key word there is "hypothetical." One can always imagine some future
> action, especially in the area of environmental regulation, but the limits in §
> 113(h) are geared to concrete, existing, remedial measures; not measures
> that might be devised at some later date.

*Id.*

The Seventh Circuit remanded the case, indicating that it was not going to engage

in a review of the available record, as requested by Defendants, to determine the scope of

any additional planned remediation. *Id.* Rather, the case was remanded, minus all but

one of the state law claims, with instruction to revisit the record to determine what, if any,

additional remediation had since been completed or was in store for the three sites. *Id.*, at

6

1135-37.  The ability of Plaintiffs to assert the remaining claims rested on the result of that determination.

On remand, this court dismissed the citizen suit again, finding that Plaintiffs were still premature with their challenge because the evidence showed that EPA was in the process of determining what was to be done to address groundwater and sediment contamination at the sites.  Another appeal resulted, as did another remand from the Seventh Circuit.  *Frey v. Environmental Protection Agency*, 403 F.3d 828 (7th Cir. 2005) ("*Frey II*").  This time, EPA's contention that the soil excavation and remediation was just the first in a stepped, cleanup process did not persuade the appellate court to continue the bar against a citizen-suit challenge.  The Seventh Circuit focused on the term "selected" as used in § 113(h) of CERCLA:

> No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action *selected* under section 9604 of this title . . . .

42 U.S.C. § 9613(h) (emphasis added).

The Court opined that EPA could not point to any clear commitment by it or CBS to take any particular action or adopt any specific plan with respect to the anticipated remediation of the ground water and sediment at the sites.  *Frey II*, 403 F.3d at 834.  In short, no groundwater or sediment remedy had been "selected."  EPA argued that it was

7

in the process of gathering further data to determine the best manner to deal with ground

water and sediment contamination at the three sites.  However, the lack of definition in

those plans and the fact that the existing ROD amendments for those three sites dealt with

only source control, or the soil excavation remedy, left the impression with the appellate

court that further remediation of water or sediment at the sites was too indefinite to bar

the citizen suit.  *Id.*, at 834-35.

> For EPA to delay Frey's suit, it must point to some objective referent that
> commits it and other responsible parties to an action or plan.  No such
> objective evidence exists in this record.  There is no timetable or other
> objective criterion by which to assess when EPA's amorphous study and
> investigation phase may end.

*Id.*, at 834.  *Frey II* did not specify how far EPA must go to demonstrate the "objective

referent."  Nevertheless, it did say that:

> We do not go so far as to hold that EPA must have issued either a ROD or a
> ROD Amendment before it obtains the breathing room afforded by §
> 113(h).  We conclude only that there must be some objective indicator that
> allows for an external evaluation, with reasonable target completion dates,
> of the required work for a site.

*Id.*, at 835.  At least with respect to the soil remediation, *Frey II* gave plaintiffs the right

to push on with their challenge.  *Id.* at 836.

Of course, the appellate court's ruling that Plaintiffs could pursue their case did not

also mean that each of the theories pursued by Plaintiffs was legally sufficient.  This court

addressed Defendants' individual challenges to those theories as a matter of law in its

Order of September 29, 2006.  All of the twelve counts brought by Plaintiffs were

challenged in some manner in those motions to dismiss.  However, after parsing through each count to assess whether it adequately stated a claim upon which relief could be granted, this court decided that only Counts Two, Three, Four, Six, Seven, and Nine survived, in some form.  Next came the summary judgment motions that are before us now and the August 17, 2007, oral argument thereon.

However, in the interim, the parties to the consent decree continued to move forward with efforts to determine alternate remedial answers to the groundwater and sediment problems at the sites.  As of October 17, 2007, final ROD amendments setting forth specific remediation plans for water and sediments were in effect for all three sites and, on February 19, 2008, the consent decree parties filed a notice of settlement of all remaining issues and agreement to a proposed comprehensive consent decree amendment. The proposed amendment must undergo a period of public notice and comment by EPA before final consent of the United States is effected and the amendment is presented to the court for approval.[8] 42 U.S.C. § 9622(d)(2).

## Analysis

EPA argues that, because it has now selected specific response actions for groundwater and sediments, the definitive commitment to further remediation at the sites required by *Frey II* is in place and the case is back in the posture of a premature challenge

---

[8] All other parties to the consent decree litigation have effected their binding consent to the proposed amendment.

to an ongoing remediation.  As easy, and in some respects practical, as it might be for this court to agree and freeze any challenge raised in this citizen suit, it does not read *Frey II* as allowing EPA to foreclose plaintiffs' challenge with regard to source control by subsequently firming up its approach to groundwater and sediment remediation.  In short, it is too little, too late.  In the future, EPA may invoke § 113(h) protections against challenges to ongoing remediations by providing more definition to any "selected" processes but, for now, this court takes to heart the Seventh Circuit's statement with regard to the completed source-control portion of the clean up:  "After a very long wait, the citizens of Bloomington are finally entitled to their day in court."  *Frey II*, 403 F.3d at 836.  EPA must rely on its defenses to this citizen suit.

While it is seems clear to the court that the horse is already "out of the gate" with respect to plaintiffs' challenge to the source-control remediation, as a practical matter, the assessment of whether EPA has done its job under the statute, requires the court to examine the total remedial program for the sites, beyond just source control.  Plaintiffs' own expert essentially agreed that the effectiveness of the chosen source control is best assessed by examining the continuing contamination level of the groundwater.  Therefore, even if plaintiffs are successful in their challenges and the procedural and/or substantive aspects of the remediation program at the sites must be revisited, it is not assumed or likely, *a priori*, that the remediation efforts to date will be reversed.  Further, evaluation of the substance of the excavation or source-control remedies at the sites must be

10

undertaken in the context of all of the remediation programs that are in place at the time of review and the additional data that then exists.  In addition, it is efficient and sensible that the agreed and soon to be proposed comprehensive consent decree amendment, with its provisions for water and sediment remediation, should significantly inform, if not guide, that review at the outset.

These are the very real and practical problems integral to any analysis of this litigation and why, when asked at oral argument, plaintiffs' counsel had a difficult time articulating exactly what form of remedy his clients desired should they prove successful with any or all of their claims.  Plaintiffs are pleased with that part of the consent decree which calls for more extensive excavation of the contaminated soil, because they feel that it offers the greatest assurance that the health of the community will not be adversely impacted.  On the other hand, they prefer to ignore the fact that, as it stands, the consent decree calls for incineration of the excavated soils and incineration is no longer an option. Even if it were determined that EPA failed to accept some level of required public input following this change of circumstances, plaintiffs simply cannot ignore that the sites have been altered and it is the scope of contamination and condition of the sites as they exist today which are of practical relevance for purposes of further remedial action.  The clock cannot be turned back now, and the court will not pretend it has such power while examining the status and procedural integrity of the cleanup process.  The court engages in this pragmatic discussion before examining the summary judgment arguments made on

a count by count basis, because it seems likely that a decision resolving some of these counts, without consideration of the impact of additional, operable units of remediation that have been selected via the latest ROD amendments and the imminent consent decree amendment, would be premature and lack practical utility.

**Count Two**

Plaintiffs have brought Count Two against the EPA, asserting that the agency failed to conduct an adequate Remedial Investigation/Feasibility Study ("RI/FS") as required by CERCLA.[9]  At the dismissal stage this court opined that, the requirements of CERCLA and the regulations that make up the National Contingency Plan ("NCP") supersede the procedural cleanup requirements of prior environmental legislation (i.e. National Environmental Policy Act) and requires that an RI/FS or some functional equivalent be conducted at Superfund sites.  In doing so, the court interpreted § 116(d) of CERCLA, which sets forth a time line for the completion of a certain number of RI/FS at Superfund sites generally, as inferentially requiring an RI/FS be conducted at all Superfund sites.  As further support for this conclusion, the court also noted that EPA had drafted regulations that spoke of an RI/FS as though it were a mandatory requirement for all Superfund sites.

_____

[9]The Amended Complaint alleges that EPA failed to conduct an RI/FS at two of the three sites with respect to the "hot spots" soil remediation.  It also alleges a failure to conduct an RI/FS with respect to the original incineration remedy called for under the consent decree.  However, since incineration is no longer the remedy selected for the three sites at issue here, such an allegation loses its relevance.

At the summary judgment stage, EPA points out that Count Two challenges the lack of an RI/FS with regard to the "hot spots" source control remedy.  At the time the initial incineration remedy was chosen, § 116(d) of CERCLA had yet to become law.  Because the hot spots remedy is a change to the original incineration remedy, EPA argues that pursuant to the NCP, the requirements to make that change are different. The NCP is the legislatively required, regulatory scheme for addressing how the federal government responds to hazardous spills and contaminated sites, such as those identified as Superfund sites.  Its origin traces to the Clean Water Act.  33 U.S.C. § 1321(c)(2).  Following passage of CERCLA, the NCP was amended in 1982.  47 Fed. Reg. 31180 (July 16, 1982).  It was amended again effective February 18, 1986, *see* 50 Fed. Reg. 47912 (Nov. 20, 1985), and once more effective April 9, 1990.  55 Fed. Reg. 8666 (March 8, 1990).

While CERCLA requires an RI/FS or its equivalent, it does not go so far as to describe specifically what should be included within an RI/FS.  Through EPA regulations, the NCP provides more detail and states that the purpose of the remedial investigation or "RI" is to collect the data necessary to adequately characterize the site for purposes of developing and evaluating remedial alternatives, while the objective of the feasibility study or "FS" is to ensure that remedial alternatives are developed and evaluated in a manner that allows the remedial action options be presented to a decision maker for an appropriate remedy selection.  40 C.F.R. § 300.430(d), (e).  Though a document entitled RI/FS was generated in connection with the initial remediation assessment at Neal's

Landfill and not the other two sites, the court finds no requirement in the statute or regulations that a document specifically titled RI/FS has ever been required.  That the investigation and study occur is the prerequisite to selecting a remedy.

Nevertheless, as EPA points out, the selection of the "hot spots" soil remedy was a change from the incineration remedy, which was selected prior to any specific statutory requirement for an RI/FS.  The NCP contains a separate set of regulations to be followed when, as a result of an enforcement action, settlement or consent decree, the original remedy chosen is altered significantly.  *See* 40 C.F.R. § 300.435(c)(2).  EPA contends that these are the regulations that apply here, not those for an initial remedy.  EPA goes on to argue that regardless of which regulations apply, they have complied with the intent, if not the strict letter, of those regulations.

This court agrees that since the "hot spots" remedy is a change from the original remedy, the regulations set forth in 40 C.F.R. § 300.435(c)(2) apply.  And, because the remedy changes here "fundamentally alter the basic features of the selected remedy with respect to scope, performance and cost," EPA was required to propose an amendment to the ROD and follow the community relations steps set forth in 40 C.F.R. § 300.435(c)(2)(ii).  Those are:

> (A) Issue a notice of availability and brief description of the proposed amendment to the ROD in a major local newspaper of general circulation;

> (B) Make the proposed amendment to the ROD and information supporting the decision available for public comment;

(C) Provide a reasonable opportunity, not less than 30 calendar days, for submission of written or oral comments on the amendment to the ROD. Upon timely request, the lead agency will extend the public comment period by a minimum of 30 additional days;

(D) Provide the opportunity for a public meeting to be held during the public comment period at or near the facility at issue;

(E) Keep a transcript of comments received at the public meeting held during the public comment period;

(F) Include in the amended ROD a brief explanation of the amendment and the response to each of the significant comments, criticisms, and new relevant information submitted during the public comment period;

(G) Publish a notice of the availability of the amended ROD in a major local newspaper of general circulation; and

(H) Make the amended ROD and supporting information available to the public in the administrative record and information repository prior to the commencement of the remedial action affected by the amendment.

40 C.F.R. § 300.435(c)(2)(ii).

These "community relations" requirements in the regulations assure that the general public have an opportunity to challenge any proposed amendment to a remedy. They do not set forth any specific scientific investigation or evaluation requirements, similar to what is set forth in 40 C.F. R. § 300.430 with respect to the remedial investigations and feasibility studies required with an initial remedy selection. The court suspects, and plaintiffs argue, that this is because the NCP in its current form presumes that any selected remedy subject to amendment has already gone through a RI/FS or reasonable equivalent. This would or should be the case with respect to remedies selected

15

after 1986.  Further, to the extent that any members of the public believe the proposed

amendment lacks a sound scientific foundation, the NCP's community relations criteria

for amendments requires the EPA to respond to any significant public comment or

objection.  So, the question remains, what about the amendment of a remedy that was

chosen at a time that an RI/FS was the regulatory guideline, but had yet to be statutorily

mandated?  This court believes the answer to that question to be that, so long as the

primary purpose of the remedial investigation and feasibility study was accomplished at

some point prior to, or as a part of, the ROD amendment process, the community relations

requirements of 40 C.F.R. § 300.435(c)(2)(ii) are the only regulatory obstacles to altering

the initial remedy.

Taking all of that into consideration, there remains the question of whether a RI/FS

or its functional objective has been accomplished with respect to the three sites at issue

here.[10]  At the time of the briefing of this motion a ROD amendment had yet to be

adopted with respect to Neal's Landfill.  That alone leaves us with an incomplete record

for a decision with respect to that site.  Furthermore, plaintiffs have produced evidence

---

[10]EPA notes that there was a document entitled "RI/FS" for the original excavation
remedy at Neal's Landfill.  While that may lead one to presume that the objectives of a RI/FS
were accomplished with respect to that site, just as this court previously found there to be no
requirement that a document with such a title be produced, it cannot be that a document so titled,
satisfies the substantive regulatory requirements.
    EPA also maintains that the Plaintiff's Amended Complaint never alleges that a RI/FS
was not accomplished for Bennett's Dump, and therefore no issue remains with respect to that
site.  While it is true that the focus of the allegations in Count Two appears to be on Neal's
Landfill and Lemon Lane Landfill, the court will not at this time read the allegations so narrowly
as to foreclose Count Two from application to Bennett's Dump as well.

that suggests that within EPA there is some question as to whether or not an RI\FS was ever accomplished.  Certain letters written by plaintiffs also submit the expert witness affidavit of Joseph G. Hailer.  However, the affidavit, for the most part, attacks the quality of what the EPA did in terms of an investigation and feasibility study or of its conclusions, as opposed to whether or not an investigation and evaluation as prescribed by the regulations was performed.  The letters, more than the affidavit, serve to create a question of material fact that remains unanswered at this point and for that reason requires the court to deny EPA's summary judgment request on Count Two.

### Count Three

As this court alluded to in its September 2006 order addressing defendants' motions to dismiss, this is the most difficult count to, figuratively, wrap one's arms around.  Due to certain mandatory language in CERCLA's cleanup standards, in answering the question of whether EPA has done what is required of it, the court must add a degree of qualitative analysis to its review of whether the mandated procedure was followed.  The statute requires that EPA "shall specifically address the long term effectiveness of various alternatives," and "shall select a remedial action that is protective of human health."  Yet, an analysis of EPA's compliance with these dictates is hampered in a dispute such as this, because there will inevitably be a difference of opinion as to whether long term effectiveness was addressed sufficiently or whether a chosen remedy is sufficiently protective of human health and environment in light of the alternatives.

17

Stated simply, the citizen groups which have fomented the litigation challenging this cleanup effort have, from the start, disagreed with the EPA and CBS on nearly every significant science issue.  Keeping in mind that there is no discernable intent within CERCLA to have this court be the ultimate arbiter of competing scientific theory or speculation, the court must proceed quite deliberately when assessing the merits of this claim.

The problem with trying to assess whether the EPA has chosen a remedy which protects the public health and environment is that the remedy is far from complete.  At the very heart of plaintiffs' scientific analysis of the shortcomings of "hot spot" soil remediation is the survey of the levels of PCBs that remain in water samples from near the sites and the ongoing escape of PCBs to the air.  Regardless of whether the EPA took too much time, or lacked sufficient commitment to a particular groundwater and sediment remediation choice to sufficiently invoke the temporary protection from citizen challenges offered by CERCLA § 113(h), the undeniable truth is that the cleanup is not near done.  Any assessment now of whether the effort has protected public health and the environment is premature in light of the fact that water treatment at two of the sites is just now getting underway.  It is certainly not an assessment that can form the basis for a summary judgment ruling.  Perhaps at trial there will be a basis for concluding that the effort to remediate the groundwater can never work in conjunction with the chosen method for remediating the soil to protect human health and the environment, but there is

no way to reach that conclusion at this point.

The court is compelled to warn the parties here that it does not read CERCLA as consistent with either of the extreme positions they have advanced.  EPA need not have adopted the remedial technique that offers the "greatest possible" protection to public health and environment. It is certainly allowed to factor in the costs and other practical elements.  Nor can the agency comply with the statutory requirement that it choose a remedy that is protective of health and environment, by employing any technique that offers superficial improvement.  If the contamination at these sites is likened to an open wound on a person's arm, it is unlikely that either a tourniquet or a small band-aid is an acceptable remedial choice in seeking to protect the victim.

**Count Four**

Plaintiffs maintain that EPA has failed to provide an adequate opportunity for meaningful, public participation in the process which lead to the selection of the  "hot spot" remediation alternative, in violation of CERCLA § 117(a).  They argue, in fact, that the record supports a summary judgment on that issue in their favor because EPA and CBS decided to abandon the original soil remediation plan in the consent degree long before they provided notice and an opportunity for comment to the public.  EPA argues that it is entitled to summary judgment because it has followed the community relations provisions of its regulations during the ROD amendment processes for the three sites and

those regulations incorporate all the statutory notice and participation requirements.

Plaintiffs rely, in part, on a misconception in developing their argument. They assert that EPA and CBS abandoned the initial remediation plan, which called for a nearly complete excavation of the contaminated soil, as though an alternative was their preferred choice. That is not the case. As the court noted earlier when reciting the history of this cleanup, it was the Indiana legislature, in an undeniable reaction to citizen complaints regarding the choice of incineration as a remedy, which passed legislation in an attempt to halt the issuance of permits for the incinerator. Plaintiffs ignore the fact that the deeper and more complete excavation called for in the consent decree, was only a part of the overall agreed solution. Incineration was the other part, and while the decree may not have expressly said so, practically speaking each was conditioned upon the other.

EPA was required to promulgate regulations which establish procedures for appropriate public participation in the "development of the administrative record on which the [EPA] will base the selection of remedial actions and on which judicial review of remedial actions will be based." 42 U.S.C. § 9613(k)(2)(B). It did so as a part of the NCP. The procedure for the initial selection of a remedy, including the public participation components, is spelled out at 40 C.F.R. § 300.430. The decision as to what remedy will be employed is required to be documented in a ROD. 40 C.F.R. § 300.430(f)(5). If the chosen remedy is altered, EPA's own regulations with respect to remedial design, require it to again go through certain processes, including public

participation components, to amend the ROD.  40 C.F.R. § 300.435(c).

Plaintiff does not contest the fact that EPA followed the processes set forth in the regulations for amending the RODs at each site, including the public hearing.  They argue, though, that it was a sham with respect to the public input because EPA and CBS had already agreed upon the "hot spots" method of soil remediation.  To support this argument, they point to the January 1999 report of the Magistrate Judge in the consent degree litigation which referred to the "now-abandoned complete excavation required in the Consent Decree" and contend that it is evidence that by at least November of 1998, CBS and EPA had agreed to another remedy and had not involved the public. Apparently, plaintiffs do not contend that EPA failed to follow the ROD amendment public notice protocols, but argue that there was a failure to involve the public in a RI/FS or functional equivalent and in the decision to abandon the total excavation part of the remedy.  EPA claims that it has followed the necessary public participation requirements of CERCLA and the NCP and that it never committed to any modified remedy until the ROD amendment process was complete.

Since there is no dispute that EPA allowed for the public participation or comment called for in 40 C.F.R. § 300.435 with respect to the ROD amendments, the issue appears to be whether there was allowance for sufficient public participation in connection with the investigation and feasibility analysis which this court has already opined (in discussing Count Two) must be accomplished prior to or as a part of any modification to

a chosen remedy.  To that end, Count Four accomplishes no more than Count Two.  If, to

achieve the goals of the required investigation and feasibility analysis, EPA necessarily

needed to include the opportunity for public participation, then a decision that a RI/FS or

functional equivalent has been accomplished will include a determination that the public

had a sufficient opportunity to contribute to that process.  Because the court has already

determined that a question of material fact remains with respect to whether EPA

conducted a RI/FS or the equivalent, it need not decide now the scope of available public

participation that CERCLA requires at that stage, if any, or whether that scope was

achieved.

As for plaintiffs' argument that EPA did not allow sufficient public input into its

decision to "abandon" the full soil excavation at these sites, that too fails to gain any

independent footing.  It was not EPA and CBS which abandoned the remedy set forth in

the consent decree.  That remedy became unworkable as a result of legislative

intervention.  For plaintiffs to assert that public comment or input was not allowed prior

to abandonment is somewhat disingenuous, in light of the fact that they and other citizen

groups were at the root of the challenge to the incineration remedy that was abandoned.

Again, plaintiffs do not want to recognize that the total excavation portion of the initial

remedy was tied to that portion of the remedy which called for incineration of all that

was excavated.  The court also notes one more time that it is undisputed that EPA allowed

for the public input that is required by that part of its regulations applicable to amending a

previously selected remedy.  That was accomplished when it went through the ROD amendment process that resulted in the selection of "hot spots" excavation as a modified method of soil remediation.  That ROD amendment constituted the first operable unit of the modification to the original incineration remedy and, subsequently, additional operable units for the sites have gone through the same amendment process with the same availability for public comment and input.

Summary judgment on Count Four, in favor of EPA, is appropriate because, to the extent the claim raised in that count remains viable, it duplicates Count Two.

**Count Six**

CERCLA provides the President, and EPA via designation, with the discretion to enter into settlements with persons potentially responsible for the cleanup of a contaminated site.  42 U.S.C. § 9622(a).  If a settlement is reached, it must be filed as a consent decree with the federal district court and subject to public review and comment before an entry of final judgment is made.  42 U.S.C. § 9622(d).  Plaintiffs claim that they are entitled to a summary judgment in their favor on their claim that EPA failed to enter its settlement with CBS on modified remedies for the sites as a consent decree.  EPA contends that while, at the time, it was negotiating towards an eventual amendment to the consent decree, it had not reached any final agreement with respect to remedies at any of

the sites and accordingly, it is entitled to summary judgment on Count Six.[11]

Part of the discrepancy between each sides' characterization of the facts is a result of plaintiffs' desire to treat the "hot spots" source control remediation as representing EPA's total replacement for the incineration remedy set out in the consent decree. The progress reports from the Magistrate Judge and the parties in the consent decree litigation make it clear that the "hot spots" excavation was never intended to be the sole unit of a final remedy. However, the discrepancy in factual interpretation can also be attributed to disingenuousness, this time on the part of EPA. It is one thing to say that EPA and CBS have not reached a final agreement that can be reduced to a document and lodged as a consent decree amendment, but quite another to take the position that the parties have yet to agree on any remedy outside that which is set forth in the original consent decree - which is what EPA argues in its summary judgment brief. Recognizing that the EPA brief was written before a couple of the new ROD amendments were completed, it still defied credulity to suggest that the parties had yet to reach an accord with respect to some of the remedial methodology which was employed even before the briefing.

_____

[11]Plaintiffs claim to be seeking summary judgment on Count Six as against CBS as well, and reaffirmed this stance at oral argument. This court does not interpret Count Six as having any application to CBS. First, in their First Amended Complaint, plaintiffs identify the target defendants in each count, and in Count Six there is no mention of CBS or its predecessors as a target defendant. Further, there is nothing in CERCLA that requires the party allegedly responsible for the contamination to lodge any settlement it reaches as a consent decree. CERCLA gives the agency, not any other party, the authority to enter into settlements and then requires that the agency lodge any such settlement with the appropriate federal court as a consent decree.

Nevertheless, the court has been provided with no precedential guide that addresses how long it should take to amend an abandoned consent decree,  or whether an amendment should be lodged at the point of agreement on a partial remedy or only after agreement is reached on what may be anticipated as a total remedial package.  In essence, with this count the court is in the same position as it was with regard to EPA's delay in "selecting" additional operable units of remediation and the application of CERCLA's § 113(h) protection against citizen suits during an ongoing remediation.  At what point is the wait too long and the plaintiffs become entitled to enforce the consent decree requirement?  The apparent remedy for the successful enforcement of this particular statutory mandate would be for this court to order the agency to lodge its agreement as a consent decree amendment or to take evidence as to what the agreement may be, thereafter define the agreement and then proceed as though it were lodged as a consent decree.  However, now that the parties have agreed to a comprehensive consent decree amendment that soon will be noticed for public comment and then presented to the court for approval, this claim is moot.

### Count Seven

Plaintiffs bring Count Seven pursuant to 42 U.S.C. § 9659, seeking a remedy against both EPA and CBS.  They claim that since there has been no amendment to the consent decree, as entered back in 1985, and excavation of source materials to the level called for by the consent decree has not been obtained and is no longer contemplated,

25

EPA and CBS have breached the requirements of the consent decree.  Alleging that the consent decree uses language which makes full excavation mandatory, regardless of any futility associated with the incinerator, plaintiffs claim an entitlement to summary judgment.

EPA argues that it is entitled to summary judgment because, under *Bennett v. Spear,* 520 U.S. 154 (1997), the CERCLA citizen suit provisions cannot be used against EPA to enforce the consent decree requirements and because CBS and not EPA is obligated to meet any excavation standards set forth in the consent decree.  CBS claims it is entitled to summary judgment because, it has not violated any requirement of the consent decree.  According to CBS, a condition precedent to excavation at the level required in the consent decree is the construction and testing of an incinerator.  At the heart of the CBS argument is the issue that continually pops up here with respect to the excavation and incineration being inextricably intertwined.

This court has already noted its agreement with the assertion that the excavation requirements in the consent decree are tied to the availability of incineration as a means to deal with that which is excavated.  The testing, permitting and approval details in the consent decree are all tied to the use of an incinerator to rid the sites of the contaminated soil.  CBS submitted the plans and permit applications for the incinerator, but the action taken by the Indiana legislature left that process dead in its tracks.  For that reason, CBS is not in violation of the consent decree for failing to conduct the full excavation as

defined in that document.

The court finds nothing in the Supreme Court's analysis in *Bennett* to substantiate the EPA's contention that it cannot be sued for a breach or violation of the consent decree. The consent decree is a requirement as that term is used in 42 U.S.C. § 9632(a)(1). Further, while EPA is correct that it is not the party required to conduct the excavation, if, as a party to the consent decree, it acted in an arbitrary manner to frustrate the intent of the parties or cause the agreed goals to be unobtainable, then it could surely be taken to task for such a breach. However, because the incineration component of the original remedy has been abandoned, is no longer a viable alternative at this time, and incineration is essentially a condition precedent to the full excavation requirement in the consent decree, EPA cannot be said to be in breach here. While a citizens suit might ultimately hold EPA responsible for not doing what it is required to do under statute, it will not be on the basis of a breach of the 1985 consent decree as it stands now.

In addition, the original consent decree's mandate of total excavation and incineration as an operative standard is moot now that a comprehensive consent decree amendment has been agreed to and in process for public comment and formal proposal. For all these reasons, summary judgment in favor of both Defendants is appropriate with respect to Count Seven.

**Count Nine**

CERCLA requires that "any hazardous substance, pollutant or contaminant that will remain onsite" be dealt with in a manner that allows all legally applicable state and federal standards ("ARARs") be met.  42 U.S.C. § 9621(d)(2)(A).  Plaintiffs claim that the lack of any bottom or side liners as well as leachate containment systems, and the "general" failure to minimize the release of hazardous substances into the environment  at the three sites is in violation of federal requirements applicable to PCBs, through the Resource Conservation and Recovery Act ("RCRA") and the Toxic Substances Control Act ("TSCA").   Count Nine is brought against both EPA and CBS for this alleged lack of compliance.

For a number of reasons, summary judgment in favor of defendants is appropriate on Count Nine.  First, because the court has already determined that plaintiff's action proceeds only as a CERCLA citizens suit, the RCRA or TSCA standards which plaintiffs claim were violated, must amount to ARARs which EPA failed to designate.  CERCLA § 121(d)(2)(A), 42 U.S.C. § 9621(d)(2)(A), provides that if a standard or requirement of other environmental legislation such as RCRA or TSCA is either "legally applicable" or "relevant and appropriate under the circumstances of the release" then EPA shall include them as ARARs.  EPA did not select or designate the standards plaintiffs refer to as ARARs.  So, even if the agency should have so designated, CBS can hardly be faulted for not complying with a standard which EPA did not designate as necessary to meet in

28

conjunction with the chosen remedy.

EPA argues that the designation of ARARs is a discretionary act and therefore it cannot be sued in a citizens action for failing to designate a particular standard as an ARAR.  The court need not determine that issue though, because there is good reason why the standards plaintiffs want met were not designated as ARARs by EPA.  First, PCBs are exempt from RCRA and regulated specifically through TSCA and corresponding regulations.  40 C.F.R. § 261.8.  So, RCRA based regulations or standards do not apply.  When passed at the end of 1976, TSCA set standards which addressed PCBs prospectively, that is those that entered the environment after January 1, 1977.  15 U.S.C. § 2605(e).  The PCBs at issue here were deposited at the sites prior to that time. The regulations drafted to implement the TSCA also differentiate between new chemical waste landfills, regulated at 40 C.F.R § 761.75, and remediation of PCBs spilled or deposited prior to 1978, regulated at 40 C.F.R. § 761.61.  The latter was appropriately designated as an ARAR by EPA in ROD amendments. Simply stated, the standards and regulations that plaintiffs believe must be met here, do not apply.  Accordingly, summary judgment is appropriate in favor of defendants on Count Nine.

**Conclusion**

While it has taken more time than many, including the Court of Appeals, believe it should have, there are now active steps either underway or finally selected to treat the

water and sediment at all these sites.  The result of that remedial effort will ultimately

determine the degree of overall success obtained through "hot spots" source control,

which was the first operable unit of this modified cleanup.  This entry has pared down

plaintiffs' citizens suit challenge to those claims which find some support in the record

and which address the EPA's alleged failure to take steps which they are required to take.

For the reasons expressed in this entry, plaintiffs' Motion for Partial Summary

Judgment (Docket # 33) is **DENIED**.  CBS's Motion for Summary Judgment (Docket #

30) is **GRANTED**.  EPA's Motion for Summary Judgment (Docket # 31) is **GRANTED**

**IN PART** and **DENIED IN PART**, insofar as EPA is entitled to summary judgment in

its favor on Counts Four, Seven and Nine.  Counts Two, Three and Six remain for trial as

against EPA only.

**IT IS SO ORDERED** this  11th   day of March 2008.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

David R. Berz
WEIL GOTSHAL & MANGES LLP
david.hird@weil.com

Daniel R. Dertke
UNITED STATES DEPARTMENT OF
JUSTICE
daniel.dertke@usdoj.gov

Mick G. Harrison
mickharrisonesq@earthlink.net

David B. Hird
WEIL GOTSHAL & MANGES LLP
david.hird@weil.com

Rudolph William Savich
rsavich@aol.com

Brent D. Taylor
BAKER & DANIELS
bdtaylor@bakerd.com