UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SARAH ELIZABETH FREY,<br>KEVIN  ENRIGHT, and<br>PROTECT OUR WOODS, INC., | )<br>)<br>) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No. 1:00-cv-00660-RLY-TAB |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, Carol Browner, | ) | |
| Administrator, and | ) | |
| CBS CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT
and PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT**

On April 20, 2000, Plaintiffs filed a "citizen suit" under the Comprehensive

Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §

9601 *et seq*., as amended by the Superfund Amendments and Reauthorization Act of

1986 ("SARA"), seeking to challenge various aspects of the environmental cleanup of

three related hazardous waste sites in the Bloomington, Indiana area: the Lemon Lane

Landfill, Neal's Landfill, and Bennett's Dump.  This case, like the underlying cleanup,

has faced a number of obstacles, including two trips to the Seventh Circuit Court of

Appeals.  *See Frey v. Environmental Protection Agency*, 403 F.3d 828 (7th Cir. 2005)

(*Frey II*); *Frey v. Environmental Protection Agency*, 270 F.3d 1129 (7th Cir. 2001).  The

case is now before the court on the United States' Motion for Summary Judgment and the

Plaintiffs' Cross Motion for Summary Judgment.  For the reasons set forth below, the court **GRANTS** the United States' Motion for Summary Judgment, and **DENIES** the Plaintiffs' Cross Motion for Summary Judgment.

## I.   Formation of a Remedial Plan

Before addressing the factual background of this case, the court will begin with a brief discussion of the steps involved in the formulation of a remedial action plan to address contaminated sites listed on the National Priorities List, like those presented in this case, under CERCLA and its related implementing regulations.

Section 116(d) of CERCLA provides that "[t]he President shall assure that remedial investigations and feasibility studies (RI/FS) are commenced for facilities listed on the National Priorities List, in addition to those commenced prior to October 17, 1986 . . . ." 42 U.S.C. § 9616(d).  CERCLA does not define nor describe what should be included in an RI/FS.  The National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. Pt. 300, republished by the EPA pursuant to Section 105 of CERCLA to cover hazardous waste sites, establishes the steps involved in formulating a remedial action plan.  According to the NCP, the purpose of a "remedial investigation (RI) is to collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives."  40 C.F.R. § 300.430 (d).  In addition, the primary purpose of the feasibility study (FS) "is to ensure that the appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected."  40 C.F.R. § 300.430 (e).

2

After the EPA has completed a remedial investigation and feasibility study of a contaminated site, the EPA evaluates each alternative based upon nine regulatory criteria. 40 C.F.R. § 300.430 (e)(9)(iii).  These include whether each alternative adequately protects human health and the environment; attains applicable or relevant and appropriate requirements under federal or state environmental laws;  achieves long-term or permanent effectiveness; and employs treatment that reduces toxicity, mobility, or volume of the contaminant.  *Id*.  The EPA also evaluates whether each alternative is feasible in terms of its implementation and cost, and takes into account the concerns of the state and the local community. *Id*.  After the EPA selects a preferred remedy, it presents it to the public in a proposed plan for review and comment.  40 C.F.R. § 300.430 (f)(ii).  Following a period of public comment, the EPA selects a final remedy and memorializes it in a public document known as a Record of Decision ("ROD").  *Id*.  With this information in mind, the court now turns to the facts of the present case.

## II.    Factual Background

From 1958 to 1972, CBS (formerly Westinghouse Electric Corporation) operated a plant in Bloomington, Indiana, where it manufactured electrical capacitors containing insulating fluid composed of polychlorinated biphenyls ("PCBs").  CBS disposed of defective capacitors in local dumps and landfills, resulting in the release of PCBs into the environment.  In addition, CBS discharged PCBs from its plant through the sewer system to the Winston Thomas Sewage Treatment Plant.

In the late 1970s, harmful levels of PCBs were detected in streams, sediments, plants, and wildlife in the Bloomington, Indiana area, which were traced to CBS' plant

3

and to six sites in, and near, Bloomington: Anderson Road, Bennett's Dump, Lemon Lane Landfill, Neal's Landfill, Neal's Dump, and the Winston Thomas Facility.  In 1981 and 1983 respectively, the plaintiffs – the United States, the State of Indiana, the City of Bloomington, and Monroe County – brought two lawsuits under CERCLA to compel cleanup of those sites.  *United States v. CBS Corp.*,[1] No. 1:81-cv-448-RLY-KPF and *City of Bloomington v. CBS Corp.*, No. 1:83-cv-009-RLY-KPF.  The cleanup selected in those decisions was ultimately included within a Consent Decree, which the court entered on August 22, 1985.  The Consent Decree required CBS (then Westinghouse) to remove all PCB-contaminated materials by excavation, if necessary, down to the bedrock, and to destroy these PCB-contaminated materials by incinerating them in a high temperature incinerator, which CBS was required to design, construct and operate.

After entry of the Consent Decree, public opposition to the incinerator arose, leading the Indiana Legislature to pass legislation aimed at blocking implementation of the incineration remedy.  As the Seventh Circuit explained in its first *Frey* decision:

> In 1991, the Indiana Legislature passed a law aimed at blocking the incinerator.  This obstacle pushed the parties – the EPA, the State of Indiana and its Department of Environmental Management, the City of Bloomington, the Bloomington Utilities Service Board, Monroe County, Indiana, and CBS –  back to the negotiating table, where they began discussions to modify the Consent Decree.

*Frey*, 270 F.3d at 1131.

The parties ultimately agreed to modified remedies for the Anderson Road Landfill, Neal's Dump and the Winston-Thomas Sewage Treatment Plant, but

---

[1] Between July 16, 2008, and July 23, 2009, the court consolidated this case and *United States v. CBS Corp.* for administrative case management.

could not agree on modified remedies for the three sites at issue in this case –

Lemon Lane Landfill, Neal's Landfill, and Bennett's Dump.  CBS argued that it

should be required to excavate only the areas of highly contaminated soil – the so-

called "hot spots."  The Environmental Protection Agency ("EPA") responded that

"hot spot" excavation is only appropriate if water treatment and sediment removal

are included in the alternative remedy.

      To resolve the dispute, the district court appointed a special master.  The parties

approached the cleanup of the sites in stages or "operable units," with each to be

incorporated in a formal ROD and presented to the court as an amendment to the original

Consent Decree.  The first stage, or "source control operable unit," addressed PCB

contamination in the former landfills.  After considering various alternatives including

total excavation of the sites, and soliciting and responding to public comments, the EPA

selected the alternative source control operable units for the three sites in three separate

ROD amendments issued on October 16, 1998 (Bennett's Dump), March 29, 1999

(Neal's Landfill), and May 12, 2000 (Lemon Lane Landfill).  Unlike the earlier Consent

Decree, however, the ROD amendments for Lemon Lane Landfill and Neal's Landfill

called for "hot spot" excavation (with respect to Bennett's Dump, excavation to

"industrial standards"), off-site disposal of the contaminated material, and construction of

a landfill cap.  The plans also called for the continuance of negotiations with respect to

water treatment and sediment removal at all three sites, and the initiation of the necessary

investigations to determine the need for interim and permanent water treatment and

sediment removal at each site.  CBS completed the source control operable remedy with

respect to all sites by the end of 2000, as required by an order issued by the court on February 1, 1999.  During this time frame, Plaintiffs brought the present action challenging the modified remedy as inadequate, thereby creating an imminent danger to the public health and the environment.

Following completion of the source control operable unit, the EPA determined through water and sediment investigations that PCBs had migrated into the cracks and fissures of the limestone bedrock (known as "karst") located underneath the three sites, and were being flushed out of the bedrock through the flow of ground and storm water into nearby springs that feed into local creeks, spreading PCBs into the sediment along those pathways.  The EPA therefore engaged in risk assessments, the purpose of which was to quantify the threat to public health and the environment from actual or threatened releases of PCBs into the environment, and the future effects of such releases upon the environment.

Based upon the results of these risk assessments, the EPA proposed three plans, and published them for comment in 2006 and 2007.  After receiving public comments, the EPA selected the second and third operable units in three separate ROD amendments issued on September 26, 2006 (Bennett's Dump), September 29, 2006 (Lemon Lane Landfill), and September 25, 2007 (Neal's Landfill).  In short, these plans called for CBS (1) to assume ownership and operation of the water treatment plant that the EPA built in 1996 at Illinois Central Spring (Lemon Lane Landfill); (2) modify and operate a groundwater collection and treatment system to capture PCB-contaminated groundwater from seeps and springs (Neal's Landfill); (3) install a passive drain system to lower the

water level in several rain-filled quarry pits (Bennett's Dump); (4) design, construct, and

operate a new water treatment plant and collection trench (Bennett's Dump); and (5)

periodically sample domestic wells.  According to the ROD Agreements, CBS must

conduct these activities until the groundwater emerging from these springs and seeps for

a 12-month period has a PCB concentration equal to or less than the PCB effluent limit of

0.3 ppb.

On February 19, 2008, the United States lodged with the court an Agreed

Amendment to the Consent Decree Providing for Remedial Actions at Neal's Landfill,

Lemon Lane Landfill, and Bennett's Dump. *United States v. CBS Corp.*, No. 1:81-cv-

448-RLY-KPF, Docket # 40.[2]  The Agreed Amendment resolved all claims between the

United States and CBS, and counterclaims asserted by CBS and co-plaintiffs, the State of

Indiana, Monroe County, and the City of Bloomington.  Notably, it outlined the

obligations of CBS with respect to operable units two and three.

On March 20, 2009, following a period for public comment, the United States

moved the court to enter the Agreed Amendment.  *Id*., Docket # 53.  The court, having

found that the Agreed Amendment was procedurally and substantively fair, its terms

were reasonable and adequate, and it was consistent with the goals and purposes of

CERCLA, entered the Agreed Amendment on July 23, 2009.  *Id*., Docket # 57 (noting

that it applied also to *City of Bloomington v. CBS Corp.*, 1:83-cv-009-RLY-KPF).  In the

---

[2] Citations to documents will include the docket number and, where appropriate, the
cause number. Citations to the administrative record will be by the alpha-numeric identification
of the applicable administrative record, by site name and by update number.  So, for example, the
citation "LLAR3" refers to "Lemon Lane Landfill Administrative Record, Update # 3."

Entry, the court found that the administrative record contained a number of documents that, when taken together, are the functional equivalent of an RI/FS.  *Id.* at 24.  In particular, the court found that the documents established that the EPA completed the functional equivalent of an RI for each site by: (1) characterizing the nature and extent of the contamination, (2) identifying applicable or relevant and appropriate requirements, and (3) preparing a risk assessment.  The court also found that the EPA completed the functional equivalent of an FS by explaining how it identified various remedial alternatives, and then selecting a response action based upon an analysis of the nine evaluation criteria set forth in the NCP.  *Id.* (citing United States' Response to Public Comments Regarding the Proposed Agreed Amendment to the Consent Decree, 1:81-cv-448-RLY-KPF, Docket # 40, Ex. 3).  In addition, the court separately found that the EPA addressed the long term effectiveness of various alternatives and selected remedial actions that are protective of human health and the environment.  (*Id.* at 29, 32).

Plaintiffs' Third Amended Complaint, filed on July 21, 2009, consists of five counts.  In Counts 1 and 4, Plaintiffs allege the EPA, the EPA Administrator, and the EPA Regional Administrator failed to complete an RI/FS as required by CERCLA prior to selection and implementation of operable units one, two, and three.  In Counts 2 and 5, Plaintiffs allege the EPA, the EPA Administrator, and the EPA Regional Administrator[3] violated CERCLA's mandate to protect the public health and the environment in its selection of operable units one, two, and three.  Finally, in Count 3, Plaintiffs allege the

---

[3] For simplicity's sake, the court will refer to the EPA, the EPA Administrator, and the EPA Regional Administrator as the "EPA."

8

EPA violated CERCLA's requirement that settlement agreements be entered in the district court as consent decrees.  Although many of these issues were addressed in the Agreed Amendment in *United States v. CBS Corp.*, No. 1:81-cv-448-RLY-KPF, the court will address the merits of the Plaintiffs' citizen-suit challenge.

Additional facts necessary for the court's determination will be addressed in the Discussion Section below.

## III.    Jurisdiction

The statutory authority for citizen suits pursuant to CERCLA was added by the 1986 SARA amendments, 42 U.S.C. § 9659.  The amendments allow a citizen to maintain a civil action against the United States and its agencies.  The grant of jurisdiction provides, in relevant part:

> [A]ny person may commence a civil action on his own behalf – (2) against the President or any other officer of the United States (including the Administrator of the Environmental Protection Agency . . .  where there is alleged a failure of the President or of such other officer to perform any act or duty under this Act, . . . , which is not discretionary with the President or such other officer.

42 U.S.C. § 9659(a)(2).  This statutory grant of authority is qualified by the phrase, "Except as provided in . . . section 9613(h) of this title (relating to timing of judicial review) . . . ."  CERCLA Section 113(h) provides, in relevant part:

> No federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action selected under [CERCLA § 104], or to review any order issued under [CERCLA § 106], in any action except one of the following:
>
> .        .        .
>
> (4)  An action under [CERCLA § 159 – citizen suits] alleging that the removal or remedial action taken under [CERCLA § 104] or secured under

> [CERCLA § 106] was in violation of any requirement of this chapter.  Such
> an action may not be brought with regard to a removal where a remedial
> action is to be undertaken at the site.

42 U.S.C. § 9613(h)(4).  In plain terms, this means that a citizen may not bring a citizen-suit challenge under CERCLA unless a "selected" remedy has been completed.  *Frey II*, 403 F.3d at 833-34 (holding that a citizen may bring suit once a "selected" remedy has been completed); *see also Pollack v. United States Dep't of Defense*, 507 F.3d 522, 525 (7th Cir. 2007) (holding that a court may review a citizen-suit challenge to a CERCLA removal or remedial action "so long as the citizen litigants wait until the cleanup is done before suing").

Although neither party raised the issue of subject matter jurisdiction, it is the court's duty to satisfy itself that it has jurisdiction over the Plaintiffs' claims before addressing the merits of those claims.  *Christianson v. Colt Indus. Op. Corp.*, 486 U.S. 800, 818 (1988); *see also Craig v. Ontario Corp.*, 543 F.3d 872, 875 (7th Cir. 2008) (noting that a court may "raise *sua sponte* the subject matter jurisdiction of the court at any time and at any stage of the proceedings") (quoting *Sadat v. Mertes*, 615 F.2d 1176, 1188 (7th Cir. 1980))).  The court finds that the decision in *Frey II* (and *Pollack*) mandates dismissal with respect to Counts 4 and 5, because the remedial actions at issue in those counts – operable units two and three – have not been "completed."  *Frey* II, 403 F.3d at 833.  Whether the holding of *Frey II* precludes this entire suit is another issue.

In *Frey II*, the Seventh Circuit reversed the district court and held that the Plaintiffs' citizen suit may proceed with respect to the source control operative units (operative unit one), even though in the EPA ROD Amendments, the EPA referred to

future "operable units" that will be implemented to address PCB contamination in the groundwater, surface water, and sediment. The Court noted that the source control operable units were completed in 1999 and 2000, yet the EPA could point to no "objective indicator" that any action or plan with respect to operable units two and three was in place as of the date of the oral argument (May 2004). *Id*. at 835.

Now that the EPA has issued its ROD Amendments at the three sites with respect to operable units two and three, the remedies of which have not been fully implemented, the court must resolve whether this case is subject to review at all – even with respect to operable unit 1. As the court noted in its previous Entry on the United States' Motion for Summary Judgment, the Seventh Circuit clearly stated that, at least with respect to operable unit one, "the citizens of Bloomington are [] entitled to have their day in court." *Id*. at 836; *see also* Docket # 53 at 10. Thus, although the "selected" remedy is technically in three operable units, the court finds it has subject matter jurisdiction over only operable unit one.

## IV.  Discussion

### A.  Count 1

Count 1 addresses the EPA's alleged failure to perform its nondiscretionary (i.e., mandatory) duty to prepare an RI/FS for operable unit one (the source control operable unit), in violation of 42 U.S.C. § 9659(a)(2). Plaintiffs argue the EPA failed to perform this duty for the following reasons: (1) the EPA failed to assess the risk of PCB exposure to sensitive populations, such as infants; (2) the EPA failed to acknowledge and assess the risks posed by PCBs that continue to be released from the sites; (3) the EPA failed to

adequately sample the sites to determine the extent of PCB contamination; (4) the EPA failed to adequately assess the potential for air releases of PCBs during hot spot cleanup at Lemon Lane Landfill; (5) the EPA relied on data that post-dates the ROD amendment for the source control operable unit; and (6) the EPA did not prepare a single document or report entitled "RI/FS."

As the court previously explained in its Entry on the United States' Motion for Summary Judgment, the EPA is not required to submit a single document entitled "RI/FS." (*See* Docket # 53 at 12-13). The NCP requires only that the EPA perform an RI/FS prior to its selection of a preferred remedy. This may be evidenced by one document, or by a multitude of documents, filed in the administrative record. Accordingly, Plaintiffs' sixth argument is without merit.

Plaintiffs' remaining five arguments essentially ask the court to review the adequacy of the EPA's investigation into the extent of the contamination at each site, its assessment of the risks involved, and its choice to conduct an alternative remedy in operable units as opposed to Plaintiffs' preferred remedy – total excavation. In this citizen-suit challenge, the court's function is not to assess the adequacy of the EPA's investigation or its discretionary decisions; rather, its role is to assess whether it fulfilled its mandatory duty to complete an RI/FS that complied with the NCP, 40 C.F.R. § 300.430. *See Bennett v. Spear*, 520 U.S. 154, 172 (1997) (in nondiscretionary citizen suit challenge, judicial review of agency action is limited to whether agency failed to perform nondiscretionary duty); *Scott v. City of Hammond, Inc.*, 741 F.2d 992, 996 (7th Cir. 1984) ("The complaint is drafted as a citizen's suit to require performance of a nondiscretionary

duty; such a suit cannot be employed to challenge the substance or content of an agency action."); *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987) (in nondiscretionary duty citizen suit, "the only required judicial role [is] to make a clear-cut factual determination of whether a violation did or did not occur"); *United States v. Sensient Colors, Inc.*, 649 F.Supp.2d 309, 333 (D.N.J. 2009) (finding plaintiff could not use citizen suit to challenge the manner in which an agency performed a nondiscretionary duty).

The administrative record, including the lengthy ROD Amendments filed by the EPA, reflect that the EPA complied with its mandatory duty to engage in remedial investigations and feasibility studies prior to selecting a preferred remedy at the sites in question. (*See, e.g.,* LLAR1 Doc. 15; NLAR1 Doc. 1; BDAR1 Doc. 7). For example, with respect to Neal's Landfill, the EPA's ROD Amendment for the source control operable unit shows that it: (1) conducted an investigation of the site and detected high concentrations of PCBs within the landfill; (2) considered five remedial action alternatives from "No Action" (Alternative 1) to "Total Excavation" (Alternative 5); (3) evaluated the alternatives based upon the nine regulatory criteria as set forth in the NCP, 40 C.F.R. § 300.430; and (4) chose "Excavation of 'Hot Spots' with Off-Site Disposal, Consolidation of Landfill Material" with a landfill cap (Alternative 4). (NLAR1 Doc. 1). Although the EPA determined that Alternative 5 would be the most protective of human health and the environment and the most effective in terms of ridding the landfill of PCB contamination, it also noted that Alternative 5: (1) would result in the most short-term adverse impacts on human health and the environment due to the removal of 320,000

cubic yards of PCB contaminated material, (2) would be the most difficult to implement in terms of disposing of the material off-site, and (3) was estimated to cost five times more than Alternative 4 ($80.24 million v. $16.13 million).  (*Id*.).  In addition, the EPA received the approval from the State of Indiana to pursue Alternative 4, and submitted that remedy for public review and comment.  The EPA conducted the same investigation and site assessment for Bennett's Dump and Lemon Lane Landfill, addressed various alternative remedies, selected the remedy after considering the nine regulatory criteria, and submitted the final remedy for public review and comment.  (LLAR1 Doc. 15; BDAR1 Doc. 7).

To the extent Plaintiffs' claims may be construed as a complete failure on EPA's part to perform the functional equivalent of an RI/FS, none of the arguments in support of their claim have merit.  First, the EPA did assess the risk of PCB exposure to sensitive populations, such as infants.  For example, the EPA evaluated hazard and cancer risks to young children and youths playing along streams at all three sites in terms of direct contact and incidental ingestion of PCB-contaminated surface water, sediment, and soil. (NLAR3 Doc. 266 at 15-17; LLAR3 Doc. 338 at 10-12; BDAR3 Doc. 123 at 9-10). At Lemon Lane Landfill, the EPA found an insignificant cancer risk, or risk within acceptable limits, for young children and youths exposed to surface water, sediment, and soil.  In the vicinity of one spring, however, the EPA did find an exposure hazard to young children and youths related to surface water, sediment, and soil.  (LLAR3 Doc. 338 at 33-35).  At Neal's Landfill, the EPA found similar results – risks to children and youths were found to be insignificant or within EPA's acceptable risk range for potential

total exposure to surface water, sediment, and soil.  In addition, a non-carcinogenic risk was found for children exposed to surface water and soil in and along Conard's Branch, a tributary of Richland Creek.  (NLAR3 Doc. 266 at 40-42).  Finally, at Bennett's Dump, the EPA found that youths were not at risk from the incidental ingestion of soil and sediment, although they were at risk from direct contact with surface water.  (BDAR3 Doc. 123 at 28-29; *see also*, LLAR Doc. 127).

Second, the EPA did acknowledge and assess the risks posed by the continuing release of PCBs at the three sites.  These risks were addressed in operable units two and three, the water and sediment phases of the modified remedies.  The EPA never took the position that operable unit one, standing alone, is an adequate replacement for the original remedy ordered in the 1985 Consent Decree.

Third, the EPA did characterize the nature and extent of the contamination at each site prior to selecting a ROD amendment for the response action in operable unit one. This is evidenced by the lengthy administrative record for operable unit one.  (*See* LLAR Docs. 5, 8, 28, 32, 39, 47, 48, 49, 80, 112, 115, 117, 118, 126; LLAR1 Doc. 15; NLAR Docs. 3, 12, 17, 21, 34, 35, 53, 54, 57; NLAR1 Doc. 1; BDAR Docs. 17, 23, 29, 43, 59, 63, 65, 71).  The specific arguments raised by Plaintiffs have been addressed previously by this court in this case and in *United States v. CBS Corp.*, No. 1:81-cv-448-RLY-KPF.

Fourth, the EPA did assess the potential for air releases of PCBs at Lemon Lane Landfill during operable unit one, and required CBS to develop air monitoring plans for all three sites.  (LLAR3 Doc. 64, Appendix E at 184; NLAR3 Doc. 8 at 8-9; BDAR3 Doc. 12 at 24).  This argument is more fully addressed in Count 2.

Lastly, the EPA did not rely on data that post-dates the ROD amendment for operable unit one.  The data was collected as part of the RI/FS process for operable units two and three.

For the reasons set forth above, the court finds, as a matter of law, that the EPA fulfilled its regulatory duty to prepare an RI/FS or its functional equivalent.  Accordingly, the United States' Motion for Summary Judgment on Count 1 is **GRANTED**, and the Plaintiffs' Cross Motion for Summary Judgment on Count 1 is **DENIED**.

## B.    Count 2

Plaintiffs allege in Count 2 that the EPA violated its mandate to protect the public health and the environment in its actions regarding operable unit one, in violation of CERCLA § 121, 42 U.S.C. § 9621 (b) and (d), and the NCP, 40 C.F.R. § 300.430(e) and (f).  The administrative record, including the ROD amendments for the three sites, reflect that the EPA considered the public health and the environment when it selected the remedial actions in this case.  (*See*, *e.g.*, NLAR1 Doc. 1 at 11; LLAR1 Doc. 15 at 18; BDAR1 Doc. 7 at 10).

Like Count 1, Plaintiffs' arguments in support of Count 2 go toward the adequacy or sufficiency of the EPA's activities.  Although the court need not, the court will address the substance of Plaintiffs' arguments.  In sum, they are: (1) Tetra Tech, an EPA consultant, determined that the extent of the contamination at Neal's Landfill remained undetermined prior to hotspot removal, resulting in unacceptable levels of PCB contamination remaining at the site; (2) the EPA failed to sufficiently prevent air releases during hotspot excavation at Lemon Lane Landfill; and (3) the EPA deemed the risk to

the public health and the environment from PCB contamination was unacceptable even after hotspot removal.  These arguments were touched upon in the court's discussion of Count 1.  For the sake of completeness, the court will address these arguments in more detail below.

Plaintiffs' first argument requires background information.  Prior to conducting the hotspot excavation at Neal's Landfill, CBS drilled borings to identify the location of hot spots.  Tetra Tech EM, Inc., an EPA consultant, issued a report, dated November 30, 1998, noting that while "the horizontal and vertical extent of the contamination has been defined properly in the majority of borings drilled," there were other borings at Neal's Landfill where the vertical extent of the contamination remained unknown. (NLAR Doc. 53 at 20).  Tetra Tech also pointed out that the areal extent of contamination at Neal's Landfill was undefined because no borings were drilled and no samples were collected outside the landfill boundaries.  (*Id*.).

In that same report, however, Tetra Tech explained that CBS will address these areas where the vertical and the areal extent of contamination were not fully defined. (*Id.* at 23).  CBS did conduct further sampling before proceeding with the hot spot response action.  (NLAR3 Doc. 12).  CBS explained that it conducted 347 soil samples in March and April 1999 "to establish the lateral and vertical extent of PCB contamination in soils around the perimeter of the site."  (*Id*. at 1, 3).  These additional samples demonstrate that the EPA addressed Tetra Tech's recommendation that additional sampling be done.

Plaintiffs further assert that the EPA failed to adequately assess the potential for air releases of PCBs during the hotspot excavation at Lemon Lane Landfill.  The event of

which Plaintiffs refer occurred over a decade ago when CBS removed the temporary cap

from the Lemon Lane Landfill as part of operable unit one and engaged in heavy

construction activities that caused, or at least facilitated, the release of PCBs into the air

in June, July, and October 2000, at levels that exceeded the EPA's action level.  The EPA

did provide information about these air emissions to the public, and held meetings in May

and June 2000.  (No. 1:81-cv-448-RLY-KPF, Docket # 40, Ex. 4 at 25-27).

After all waste handling operations were completed for operable unit one at

Lemon Lane Landfill and all exposed waste surfaces were covered, CBS operated the air

monitors at the site for three days to obtain background samples from the fence line and

from one residential property.  (*Id*.).  All of these samples were below action levels, and

several were below the detection limit.  (LLAR3 Doc. 187 at 41).  The EPA concluded

that the elevated concentrations of the previous months had been caused by the

construction relating to operative unit one.  (1:81-cv-448-RLY-KPF, Docket # 40, Ex. 4

at 25-27).  Since the site is now covered with a new landfill cap, there is no need for any

additional monitoring at the site.

Lastly, Plaintiffs argue that after implementation of operable unit one – the source

control remedy – the EPA determined that continuing PCB releases from Lemon Lane

Landfill and Neal's Landfill created an unacceptable risk to human health and the

environment. This, they argue, is evidence that operable unit one was inadequate to

protect the public health and the environment.

Plaintiffs' argument ignores the fact that the remedy was not limited to operable

unit one.  Rather, operable unit one was one of three stages designed to address the PCB

18

contamination at those sites.  In other words, the fact that some PCBs remained at these

sites and that some migrated through the karst system, is not evidence that the hotspot

removal failed.  The hotspot removal accomplished what it was designed to do, *i.e.*,

remove the most highly contaminated areas and consolidate the remainder under a

landfill cap.  The rest of the remedy – namely, operative units two and three – is directed

at addressing the continuing releases of PCBs in the groundwater and sediment, and

ensures that the overall remedy is protective of human health and the environment.

Accordingly, the United States' Motion for Summary Judgment on Count 2 is

**GRANTED**, and the Plaintiffs' Cross Motion for Summary Judgment on Count 2 is

**DENIED**.

### C.   Count 3

Count 3 of Plaintiffs' Third Amended Complaint alleges the EPA failed to enter a

consent decree between it and *CBS, et al.* regarding operable unit one with the district

court, in violation of CERCLA § 122 (d), 42 U.S.C. § 9622(d).  That statutory section

provides, in relevant part:

> Whenever the President enters into an agreement under this section with
> any potentially responsible party with respect to remedial action . . . the
> agreement shall be entered in the appropriate United States district court as
> a consent decree.

42 U.S.C. § 9622(d)(1)(A).

Plaintiffs concede that the Agreed Amendment to the Consent Decree has been

filed with the court.  They argue, however, that the parties never intended to file an

amendment to the Consent Decree, and only did so because they filed the present action.

On this ground, they believe they should be deemed prevailing parties entitled to attorney's fees and expenses, a declaratory judgment, and an injunction against future similar violations, and appropriate statutory fines and penalties for this violation.

In support of their argument, Plaintiffs cite the EPA Fact Sheet for Lemon Lane Landfill, dated January 2000.  (Docket # 32, Ex. 10).   In relevant part, the document provides, "Consent Decree amendments for Bennett's Dump, Neal's Landfill, and the Lemon Lane Landfill Consent Decree sites will not be submitted to the Court.  The work at these sites is being performed consistent with the order by Federal Judge S. Hugh Dillin, directing completion of all source control measures by December 31, 2000, rather than additional amendments."  (*Id.* at 3).   This document reflects that the parties did not file an agreed amendment to the Consent Decree following a final decision as to operable unit one because the district court ordered them not to do so.

The district court would not order the parties to violate a statutory mandate.  The record in this case supports that statement. The Agreed Amendment to the Consent Decree was lodged after the parties negotiated the best course of action to address the final stages of the remedial action at those sites – *i.e.*, water treatment and sediment removal.  Although it took many years to reach a settlement, the fact remains that a settlement did occur.  Accordingly, despite Plaintiffs' protestations to the contrary, Count 3 is moot.  Accordingly, the United States' Motion for Summary Judgment on Count 3 is **GRANTED**, and the Plaintiffs' Cross Motion for Summary Judgment on Count 3 is **DENIED**.

**V.      Conclusion**

The administrative record reflects that the EPA complied with its statutory and regulatory obligations under CERCLA to select a remedy that is protective of the public health and the environment, is cost effective, and provides for long-term solutions and alternative treatment technologies to the maximum extent possible.  In addition, the EPA complied with its obligation to file its settlement agreement with CBS, et al., in a consent decree filed with the court.  Finally, the court, *sua sponte*, concludes that it does not have subject matter jurisdiction over Counts 4 and 5 because the challenge in those counts relates to operative units two and three – remedies that are not yet complete. Accordingly, the United States' Motion for Summary Judgment (Docket # 81) must be **GRANTED**, and the Plaintiffs' Cross-Motion for Summary Judgment (Docket # 87) must be **DENIED**.

**SO ORDERED** this 29th day of March 2012.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.